148

SCHUMP ET AL., APPELLANTS AND CROSS-APPELLEES, *v.*
FIRESTONE TIRE AND RUBBER COMPANY, APPELLEE AND CROSS-APPELLANT.

[Cite as Schump *v.* Firestone Tire & Rubber Co. (1989), 44 Ohio St. 3d 148.]

(No. 88-348—Submitted April 4, 1989—Decided August 2, 1989.)

*Scanlon & Gearinger Co., L.P.A., James A. Rudgers* and *Terence E. Scanlon,* for appellants and cross-appellees.

*Amerman, Burt & Jones Co., L.P.A., William D. Wendell, Gerald P. Leb* and *David T. Moss,* for appellee and cross-appellant.

WRIGHT, J.    This appeal raises two questions: first, whether plaintiffs may maintain a products liability action against defendant employer under the dual-capacity doctrine,[1] and, second, whether summary judgment on plaintiffs' intentional tort claim was appropriate. We answer both questions in the negative. Accordingly, the decision of the court of appeals is affirmed.

## I

This court first recognized an action under the dual-capacity doctrine in *Guy* v. *Arthur H. Thomas Co.* (1978), 55 Ohio St. 2d 183, 9 O.O. 3d 138, 378 N.E. 2d 488. In *Guy,* we held that a hospital employee could maintain a medical malpractice action against the hospital notwithstanding the bar to employee civil actions provided in the workers' compensation system. By providing treatment to the employee, the hospital assumed the traditional obligations attendant to a hospital-patient relationship, which obligations were "unrelated to and independent of

[1] Since we hold that R.C. 4121.80 has no application in this case, we express no opinion on Firestone's argument that the statute has completely abrogated the dual-capacity doctrine.

those imposed upon it as an employer * * *." *Id.* at syllabus.

Later, in *Freese* v. *Consolidated Rail Corp.* (1983), 4 Ohio St. 3d 5, 4 OBR 5, 445 N.E. 2d 1110, we found the dual-capacity doctrine to be unavailable to a motorcycle police officer injured while traveling the city's streets in the regular course of his employment. We stressed that "what must be determined is whether the employer stepped out of his role as such, and had assumed another hat or cloak * * *," and that the city's statutory duty to keep its streets clear and free from nuisance did not "generate obligations to this employee independent of and unrelated to the city's obligations as an employer." *Id.* at 11, 4 OBR at 9-10, 445 N.E. 2d at 1114-1115.

In *Bakonyi* v. *Ralston Purina Co.* (1985), 17 Ohio St. 3d 154, 17 OBR 356, 478 N.E. 2d 241, this court considered at length the circumstances under which a products liability action may be maintained against an employer under the dual-capacity doctrine. Quoting *Freese, supra,* at 12, 4 OBR at 11, 445 N.E. 2d at 1116, we first summarized:

" '* * * [I]n order for the dual-capacity doctrine to apply, there must be an allegation and showing that the employer occupied two independent and unrelated relationships with the employee, that at the time of these roles of the employer there were occasioned two different obligations to this employee, and that the employer had during such time assumed a role other than that of employer.' " *Bakonyi, supra,* at 157, 17 OBR at 358, 478 N.E. 2d at 243-244.

The employer in *Bakonyi* purchased liquid fertilizer, which it diluted, for two purposes: (1) use in its own greenhouse operations; and (2) resale to the public. An employee was injured in the greenhouse when the fertilizer was sprayed in his eyes; he argued that the dual-capacity doctrine should apply because his employer was engaged in the public sale of this fertilizer. In rejecting this argument, we noted that although the employer was both consumer and distributor, each capacity having its own attendant obligations, the employee was injured by the employer's role as consumer, *i.e.,* by the employment use and not the public sale use. *Bakonyi, supra,* at 157, 17 OBR at 359, 478 N.E. 2d at 244. Accordingly, we found that the employment relationship predominated and that the employer had not assumed another capacity to the employee. *Id.*

Plaintiffs herein rely on *Mercer* v. *Uniroyal, Inc.* (1976), 49 Ohio App. 2d 279, 3 O.O. 3d 333, 361 N.E. 2d 492, which we agree is a strikingly similar case. In *Mercer,* an employee of the American Stevedoring Corporation was leased to Uniroyal. The employee was injured on the job while riding in a truck leased by Uniroyal from Avis Truck Rental, which truck happened to be equipped with Uniroyal tires. When the employee sued Uniroyal alleging that one of the tires was defective, Uniroyal argued that the action was barred under the workers' compensation system. In reversing summary judgment for Uniroyal, the court of appeals held that the dual-capacity doctrine was applicable, finding that "the hazard was not necessarily one of employment, but was one common to the public in general. * * *" *Id.* at 285, 3 O.O. 3d at 336, 361 N.E. 2d at 496. The court also noted that "[i]t was only a matter of circumstance that the tire on the truck in which the plaintiff was riding was a Uniroyal tire rather than a Sears, Goodyear or Goodrich. * * *" *Id.* at 285, 3 O.O. 3d at 337, 361 N.E. 2d at 496.

Firestone attempts to distinguish

*Mercer* by arguing that here it was *not* a "matter of circumstance" that the truck in which Schump was injured was equipped with Firestone tires. The record shows that Firestone equipped all its trucks with Firestone tires as a matter of company policy. Joseph Brown, a former Firestone employee who served as a manager at the Brookpark facility, stated:

"At all times during my employment at the Firestone Retread Plant in Brookpark, Ohio, it was Firestone company policy and practice to equip all fleet vehicles with Firestone tires and to use only new Firestone tires on the steering axle of all trucks and other vehicles used at that facility. Firestone retread tires were used on the non-steering axles of tractors and trucks and on trailers. Occasionally, when no Firestone casings were available, casings of other manufacturers would be used with Firestone retreading."

Firestone's attempt to distinguish *Mercer* is not persuasive. That it was company policy to use Firestone tires does not change the fact that any defect in those tires would create a hazard common to the public in general and not just to Firestone employees. Thus, were we to adopt the rationale of *Mercer* there would be viability in plaintiffs' products liability action.

*Mercer*, however, appears to represent a view without support in any other state aside from California. Only in California has the dual-capacity doctrine been expanded to such lengths to allow an employee's products liability action. See, *e.g., Douglas* v. *E. & J. Gallo Winery* (1977), 69 Cal. App. 3d 103, 137 Cal. Rptr. 797. However, the California Legislature amended its workers' compensation statutes in 1982 and abolished the dual-capacity doctrine except in the narrowest of circumstances. See West's Ann. Cal. Lab. Code, Section 3602.

Thus, it now appears that *Mercer* stands alone and we reject its rationale. See 2A Larson, Law of Workmen's Compensation (1988), Section 72.83.

It is universally held that where an employer designs and manufactures a product for use by its employees and not for sale to the general public, an employee injured while using that product within the scope of his employment may not maintain a products liability action against his employer under the dual-capacity doctrine on the theory that the employer assumed an independent role as manufacturer. See, *e.g., Bowen* v. *Goodyear Tire & Rubber Co.* (Ala. 1987), 516 So. 2d 570; *Hills* v. *Salt River Project Assn.* (App. 1985), 144 Ariz. 421, 698 P. 2d 216; *Campbell* v. *Black Mountain Spruce, Inc.* (Colo. App. 1983), 677 P. 2d 379; *Roberson* v. *Nooter Corp.* (Fla. App. 1984), 459 So. 2d 1156; *Rosales* v. *Verson Allsteel Press Co.* (1976), 41 Ill. App. 3d 787, 354 N.E. 2d 553; *Needham* v. *Fred's Frozen Foods, Inc.* (1977), 171 Ind. App. 671, 359 N.E. 2d 544; *Baker* v. *Armco, Inc.* (Mo. App. 1984), 684 S.W. 2d 81; *Stewart* v. *CMI Corp.* (Utah 1987), 740 P. 2d 1340. See, also, *Shook* v. *Jacuzzi* (1976), 59 Cal. App. 3d 978, 129 Cal. Rptr. 496; *Knous* v. *Ridge Machine Co.* (1979), 64 Ohio App. 2d 251, 18 O.O. 3d 220, 413 N.E. 2d 1218; *Simpkins* v. *Delco Moraine Div.* (1981), 3 Ohio App. 3d 275, 3 OBR 319, 444 N.E. 2d 1064.

It could be argued that where an employer manufactures a product for sale to the general public and for its own use, an employee injured while using the product should be allowed to bring a products liability action against his employer. Certainly the strong public policies underlying the law of products liability are furthered in all cases where product manufacturers and distributors are held accountable

for injuries occasioned by product defects. However, to allow an employee to sue his employer for injuries which are predominantly work-related, and for which, as here, the employee has received workers' compensation benefits, would be to elevate the public policy on which products liability is based over the constitutional imperative contained in Section 35, Article II of the Ohio Constitution. That section provides that workers' compensation benefits "* * * shall be in lieu of all other rights to compensation, or damages, for such death, injuries, or occupational disease, and any employer who pays the premium or compensation provided by law * * * shall not be liable to respond in damages at common law or by statute for such death, injuries or occupational disease. * * *"

Moreover, we believe that sustaining an employee's products liability action in this context would be inconsistent with the basic theory underlying the dual-capacity doctrine. We accept the view expressed in *Weber* v. *Armco, Inc.* (Okla. 1983), 663 P. 2d 1221, 1226-1227, which states:

"* * * The decisive dual-capacity test is not concerned with how separate or different the second function of the employer is from the first, but whether the second function generates obligations unrelated to those flowing from that of employer. This means that the employer must step outside the boundaries of the employer-employee relationship, creating separate and distinct duties to the employee; the fact of injury must be incidental to the employment relationship."

In *Mercer, supra,* the employee was provided a truck for use in his employment, and the truck happened to be equipped with tires manufactured and sold by his employer. Certainly any non-employee user of the truck would have a cause of action for injuries resulting from defects in the truck's tires. However, "[w]hat matter[s] is that, *as to this employee,* the product was manufactured as an adjunct of the business, and furnished to him solely as an employee, not as a member of the consuming public. What the employer does with the rest of his output could not change this central fact. * * *" (Emphasis *sic.*) 2A Larson, *supra,* at 14-241, Section 72.81(c).

As stated in *Weber, supra,* at 1226: "* * * If the employer is also the manufacturer of the product which caused the employee's injury, the two personas of manufacturer and employer are interrelated. An employer has a duty to provide a safe workplace for his employees. If an employer provides an employee with a defective machine or tool to use in his work, he has breached his duty as a manufacturer to make safe machinery, and his duty as an employer to provide a safe working environment. Yet, the two duties are so inextricably wound that they cannot be logically separated into two distinct legal personas." Since in *Mercer, supra,* both the truck *and* its tires were provided to Mercer for use in his employment, the obligations generated from the provision of those tires were neither independent of nor unrelated to the employment relationship. Accord *Longever* v. *Revere Copper & Brass, Inc.* (1980), 381 Mass. 221, 408 N.E. 2d 857; *Peoples* v. *Chrysler Corp.* (1980), 98 Mich. App. 277, 296 N.W. 2d 237.

Similarly, in this case Schump was provided with a truck for use in his employment, and the truck was equipped with Firestone tires per defendant's company policy. Thus, the tires were furnished to Schump solely as an employee and not as a member of the consuming public. We hold that where an employer manufactures a product for public sale and for its own use, and

an employee is injured while using the product within the scope of his employment, the employee may not maintain a products liability action against his employer under the dual-capacity doctrine. *Bakonyi, supra.* Accordingly, we affirm the judgment against plaintiffs on their products liability claim.

II

In its cross-appeal, Firestone asserts that it was entitled to summary judgment on plaintiffs' intentional tort claim under the standards set forth in *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489. In *Van Fossen,* paragraph four of the syllabus, we held that R.C. 4121.80(G) could not be applied retroactively to causes of action which accrued prior to its effective date. We then proceeded to examine the definition of "intent" and identify the requisites to establishing an intentional tort of an employer under our earlier decisions in *Blankenship* v. *Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St. 2d 608, 23 O.O. 3d 504, 433 N.E. 2d 572, and *Jones* v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046. *Van Fossen, supra,* at 109-118, 522 N.E. 2d at 498-505.

In the instant case, the trial court granted summary judgment on plaintiffs' intentional tort claim solely on the basis of R.C. 4121.80. The court of appeals correctly reversed this holding. Since the trial court has not had an opportunity to consider plaintiffs' intentional tort claim under the applicable common-law standards as announced in *Van Fossen, supra,* this matter is remanded for reconsideration of plaintiffs' intentional tort claim in light of *Van Fossen.*

For the foregoing reasons, the judgment of the court of appeals on this issue is also affirmed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment affirmed
and cause remanded.*

＼ MOYER, C.J., HOLMES and BROGAN, JJ., concur.

SWEENEY, DOUGLAS and H. BROWN, JJ., dissent.

JAMES A. BROGAN, J., of the Second Appellate District, sitting for RESNICK, J.

SWEENEY, J., dissenting. I must respectfully dissent from the decision of the majority today because it ignores the fundamental underpinnings of products liability law. In *Bowling* v. *Heil Co.* (1987), 31 Ohio St. 3d 277, 284, 31 OBR 559, 565, 511 N.E. 2d 373, 378-379, this court quoted with approval Comment *c* to Section 402A of the Restatement of the Law 2d, Torts (1965) 349-350, regarding the philosophical foundation of the products liability doctrine. Comment *c* provides:

"On whatever theory, the justification for strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward *any* member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; *that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production* against which liability in-

surance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products." (Emphasis added.)

Stated differently, products liability law is premised upon a benefit-burden analysis. To the extent that a manufacturer has benefited from the marketing and distribution of a product to the consuming public, it must bear the burden of compensating individuals injured as a result of the defective condition of goods comprising a portion of its total output. See *Flaugher* v. *Cone Automatic Machine Co.* (1987), 30 Ohio St. 3d 60, 69-70, 30 OBR 165, 173-174, 507 N.E. 2d 331, 339-340 (Sweeney, J., dissenting).

As recognized in *Bowling* v. *Heil Co., supra,* at 282, 31 OBR at 563, 511 N.E. 2d at 377, the liability of the manufacturer of a defective product under Section 402A is not predicated upon fault principles. Rather, Section 402A focuses upon the defective condition of the product, whether "the seller is *engaged in the business of selling* * * * [the] product," and whether the product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." (Emphasis added.)

In this regard, Justice Mosk of the California Supreme Court, dissenting in *Daly* v. *General Motors Corp.* (1978), 20 Cal. 3d 725, 760, 144 Cal. Rptr. 380, 401-402, 575 P. 2d 1162, 1183-1184, summarized the relevant inquiry as follows:

"* * * The liability issues are simple: was the product or its design faulty, did the defendant inject the defective product into the stream of commerce, and did the defect cause the injury? The conduct of the ultimate consumer-victim who used the product in the contemplated or foreseeable manner is wholly irrelevant to those issues."

In the case at bar, appellee Firestone meets the foregoing criteria if the allegations of appellant are correct. It is undisputed that Firestone manufactured the tire in question and that similar tires were injected into the stream of commerce. It remains a jury question whether the tire was defective and, if so, whether the defect was the proximate cause of appellant's injuries. Just as this court found the negligent conduct of the plaintiff to be irrelevant in a products liability context, the employment status of appellant in the instant case is likewise irrelevant. It is mere happenstance that the allegedly defective tire appeared on a vehicle owned by Firestone and that Firestone was, at the same time, appellant's employer. Firestone's liability to appellant is predicated upon the relationship between a manufacturer and an ultimate consumer. From the standpoint of products liability law, the employer-employee relationship of the two parties has no bearing on the special duty owed to consumers by manufacturers. This duty remains the same irrespective of the employment status of the victim/consumer.

As eloquently stated by the California Supreme Court in *Bell* v. *Industrial Vangas, Inc.* (1981), 30 Cal. 3d 268, 279, 179 Cal. Rptr. 30, 37, 637 P. 2d 266, 273:

"The public policy goals underlying product liability doctrine should not be subverted by the mere fortuitous circumstance that the injured individual was an employee of the manufacturer whose product caused the injury. If the injured individual had not been an employee, he would have had a cause of action against the defendant. * * *"

While a superficial argument may be advanced that a common-law action

in negligence is likewise foreclosed by the Workers' Compensation Act, the requirement to exercise ordinary care underlying the cause of action is a general duty imposed on the population as a whole. It was precisely this fault-based system which was superseded by the Workers' Compensation Act with respect to workplace injuries. In its place is a no-fault compensation scheme focusing instead upon the relationship between employer and employee.

Acknowledging that enactment of the California Workers' Compensation Act was merely intended to supplant common-law actions based on a general duty of due care that an employer would otherwise owe to an employee, the *Bell* court observed:

"Workers' compensation laws were adopted long before a manufacturer's strict liability in tort — the *Greenman* v. *Yuba Power Products, supra,* 59 Cal. 2d 57, doctrine — came into vogue. Thus, there is no justification whatsoever for finding any legislative intent to adopt a scheme in 1911-1917 that would withhold from an employee the protection that *Greenman* v. *Yuba Power Products, Inc.,* now requires 'manufacturers' provide every member of the using public. The 'historic tradeoff' did not encompass the giving up of rights not yet in being." *Bell, supra,* at 278, 179 Cal. Rptr. at 36, 637 P. 2d at 272.

Similarly, the trade-off implicit in the Ohio Workers' Compensation Act involved the relinquishment of a cause of action in simple negligence in exchange for a more certain and expeditious recovery.

Recognition of this crucial distinction is apparent from a review of the relevant Ohio decisions on the subject. In *Guy* v. *Arthur H. Thomas Co.* (1978), 55 Ohio St. 2d 183, 9 O.O. 3d 138, 378 N.E. 2d 488, this court cor-rectly determined that the Workers' Compensation Act does not foreclose a common-law action by the employee-patient against the employer-hospital predicated upon the *special* duty, unrelated to the employment, owed by the provider of medical services. Conversely, in *Freese* v. *Consolidated Rail Corp.* (1983), 4 Ohio St. 3d 5, 4 OBR 5, 445 N.E. 2d 1110, it was held that an action in simple negligence predicated upon the *general* duty of a municipality owed to the public at large to keep its streets free of nuisance was unavailable to a police officer employed by the city and injured in the course of his employment because the condition of the street upon which he was traveling was in a state of disrepair. Workers' compensation, it was held, was his exclusive remedy, since patrol of the city streets was a routine part of the officer's employment. Compare *Jones* v. *Kaiser Industries Corp.* (1987), 43 Cal. 3d 552, 237 Cal. Rptr. 568, 737 P. 2d 771.

*Guy* and *Freese* are easily reconciled by reference to the duty owed by the alleged tortfeasor. Thus, the central determinant in ascertaining "dual capacity" is whether the entity to which such characterization is ascribed occupies a status creating a special duty separate and apart from that owed by it as an employer. Where the additional duty is one which is merely owed to the public at large, it is not separate and apart from the obligations of the employer under the workers' compensation law since such duty was supplanted by the statute with respect to its employees.

Where a special duty *does* exist, however, workers' compensation should not be an exclusive remedy. Recognition of this central principle is what undergirds the decision in *Bell* and is precisely why the California Supreme Court viewed the *Bell* result

as the natural consequence of applying the reasoning of its prior holding in *Duprey* v. *Shane* (1952), 39 Cal. 2d 781, 249 P. 2d 8. *Bell, supra,* at 282, 179 Cal. Rptr. at 39, 637 P. 2d at 275. The facts of *Duprey* and the law announced therein are virtually identical to the facts and law contained in *Guy* v. *Arthur H. Thomas Co., supra.* In fact, *Duprey* was cited with approval in *Guy. Id.* at 187-189, 9 O.O. 3d at 141-142, 378 N.E. 2d at 491-492.

The California court in *Duprey* (as did this court in *Guy*) recognized that the relationship between a health care provider and a patient is separate and apart from the employer-employee relationship. Stated differently, the former relationship creates a special duty unaffected by the workers' compensation law, which is directed to the latter relationship. As stated by the California Supreme Court in *D'Angona* v. *County of Los Angeles* (1980), 27 Cal. 3d 661, 666, 166 Cal. Rptr. 177, 181, 613 P. 2d 238, 242:

"* * * Underlying *Duprey* is the rationale that if any injury arises from a relationship which is distinct from that of employer and employee and invokes a different set of obligations than the employer's duties to its employee, there is no justification for shielding the employer from liability at common law."

The majority, in a vain attempt to reconcile the opinion of this court in *Bakonyi* v. *Ralston Purina Co.* (1985), 17 Ohio St. 3d 154, 17 OBR 356, 478 N.E. 2d 241, with its prior decisions in

*Guy* and *Freese,* has attempted to apply the nebulous test announced in *Bakonyi,* which sought to ascertain which relationship (employer-employee or manufacturer-consumer) predominated.

This approach is fraught with peril and ignores the thrust of our previous pronouncements. In my view, the approach taken in *Guy* should continue to guide the decisions of this court. Recognizing that the "predominance test" would lead to a morass of false distinctions, Justice Locher observed in *Guy*:

"It has been stated that the decisive test of dual-capacity is not with how separate the employer's second function is from the first, but whether the second function generates obligations unrelated to those flowing from the first, that of an employer. * * *" *Id.* at 188, 9 O.O. 3d at 141, 378 N.E. 2d at 491.

The majority correctly rejects the attempt by Firestone to distinguish the decision in *Mercer* v. *Uniroyal, Inc.* (1976), 49 Ohio App. 2d 279, 3 O.O. 3d 333, 361 N.E. 2d 492, from the present case. The alleged basis for such distinction is that, in *Mercer,* a tire manufactured by Uniroyal entered the stream of commerce and was used to equip a vehicle owned by a third party (Avis Truck Rental). The vehicle was subsequently leased to Uniroyal. Firestone contends that in the instant case its manufacturing plant supplies such tires directly to the Brookpark Retread Center.[2] Thus, under the

---

[2] It is the contention of Firestone that the only method by which it may escape liability under such circumstances is to equip its trucks with tires manufactured by its competitors. There is another alternative, however. As noted by one commentator, the courts have "* * * reminded American industry of its traditional quest for excellence and workmanship, and of its

inescapable responsibility for providing these. Despite the alarms, a manufacturer or merchandiser still has a complete defense to an action in strict liability: a product free from defects." Lascher, Strict Liability in Tort for Defective Products: The Road To and Past Vandermark (1965), 38 So. Cal. L. Rev. 30, 59.

theory advanced by Firestone, the fact that it equipped its truck with a tire of a type commonly available to the public, but which was supplied directly from its factory without entering the stream of commerce, absolves it of liability. Conversely, if Firestone had supplied the tire to a wholesaler which, in turn, provided the tire to a Firestone retailer for installation on its own vehicles (an unlikely event), liability could result. This illogical distinction ignores the imperatives of products liability law, which has never conditioned recovery upon whether the *particular item* resulting in injury entered the stream of commerce.

As mentioned previously, products liability law is predicated upon the recognition that the benefits derived from exploitation of the market through the sale of a product give rise to a corresponding responsibility to compensate those injured by defective items comprising a portion of the total output. Thus, the product for purposes of this inquiry is not limited to the particular item which produced the injury but the type of product represented thereby.

Consequently, it has been observed:

"As a matter of policy, the requirement of a seller is grounded in the theory of enterprise liability. That is, the law of strict liability is based upon the decision in policy that the loss which is caused by a defective product should be spread over as large a group of people as possible. The group which bears the loss should be composed of those who benefit from the product. It is the seller who is the primary and original beneficiary *of the products sold.* Ultimately, it is all those who purchase from the seller who benefit from a product and the seller's loss will be distributed among those persons by increased prices." (Emphasis added.) Sherman, Products Liability for the General Practitioner (1981) 229-230, Section 7.23.

It is therefore immaterial whether the particular item producing injury entered the stream of commerce. For purposes of products liability analysis, all that is required is that the manufacturer derived benefits from the marketing of that type of product to the general public. Thus, products liability law provides a straightforward and understandable test for determining when an employee-consumer is limited to his statutory remedy when injured in the course of employment by products manufactured by his employer. Where such items are manufactured solely for use by the employees of the manufacturer and not marketed to the general public, workers' compensation should be the exclusive remedy. Prior to the enactment of the workers' compensation statutes, recourse by employees would have been an action at common law predicated upon simple negligence. Assuming an action in strict products liability would have been cognizable at that time, recourse to that theory of recovery would have nevertheless been unavailable under the foregoing circumstances because, pursuant to Section 402A(1)(a) of the Restatement of Torts, the employer was not "engaged in the business of selling such a product * * *." See 2 Restatement of the Law 2d, Torts (1965) 350-351, Section 402A, Comment *f; Prosser & Keeton on Torts* (5 Ed. 1984) 705, Section 100; *Suklijian* v. *Charles Ross & Son Co., Inc.* (1986), 69 N.Y. 2d 89, 96, 511 N.Y. Supp. 2d 821, 824, 503 N.E. 2d 1358, 1361; *Treadwell Ford, Inc.* v. *Campbell* (Ala. 1986), 485 So. 2d 312, 318.

This was precisely the basis upon which the courts in *Shook* v. *Jacuzzi*

(1976), 59 Cal. App. 3d 978, 129 Cal. Rptr. 496, and *Williams* v. *State Compensation Ins. Fund* (1975), 50 Cal. App. 3d 116, 123 Cal. Rptr. 812, concluded that an employee injured by a device constructed by and used solely in the business of the employer was limited to compensation under the statutory provision. Accordingly, the most appropriate criterion upon which to determine whether or not an employee is limited to remedies afforded by the Workers' Compensation Act should be whether the employee could pursue an action in strict products liability against the manufacturer of the defective product were he a member of the general public. If at common law his tort remedy would have been limited to an action in simple negligence (*i.e.*, the manufacturer of the item responsible for his injuries was not engaged in the business of selling products of its type), he would be limited to recovery under the Workers' Compensation Act.[3]

Unfortunately, the majority has chosen to perpetuate the confusion wrought by *Bakonyi*. Such confusion is destined to continue unabated henceforth.

DOUGLAS and H. BROWN, JJ., concur in the foregoing dissenting opinion.

---

[3] Instead, the majority, in its blanket rejection of liability irrespective of the product's introduction into the stream of commerce, claims that " '[w]hat matter[s] is that, *as to this employee,* the product was manufactured as an adjunct of the business, and furnished to him solely as an employee, not as a member of the consuming public. What the employer does with the rest of his output could not change this central fact. * * *' " (Emphasis *sic.*)

However, what the employer in his role as a manufacturer does with the rest of his output does alter the applicable law. The decision to exploit the market through the introduction of the product into the stream of commerce generates obligations to all who are injured by that portion of the product line which proves to be defective. These obligations are not discharged by virtue of the participation in the workers' compensation system by the manufacturer/employer and the fortuitous circumstance (fortunate for the manufacturer) that the injured party happened to be his employee.